Filed 2/11/15  P. v. Galindo CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>OSCAR GALINDO,<br><br>Defendant and Appellant. | F066963<br><br>(Super. Ct. No. BF141009A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John W. Lua, Judge.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Amanda D. Cary and Lewis A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## *INTRODUCTION*

On March 8, 2012, defendant Oscar Galindo, a previously convicted felon, was involved in two fist fights. The first fight occurred with a group of juveniles on defendant's property. The second fight occurred approximately 18 minutes later at the residence of the juvenile who was defendant's primary adversary. Defendant was rendered unconscious after the second fight. Soon after regaining consciousness, defendant fled to a friend's house where he retrieved his friend's sawed-off shotgun for protection. A short time later, defendant returned home and discovered a door to his shed had been kicked in. Believing the same juveniles were responsible and afraid he might be attacked again at home, defendant walked towards the juvenile's residence with the shotgun. In view of that residence, but without seeing anyone in the yard, defendant fired the shotgun at least twice towards the ground in an effort to frighten his attackers. Law enforcement responded to the scene and defendant saw a sheriff's deputy so he threw the shotgun and fled. Defendant was arrested shortly thereafter.

On May 7, 2012, the Kern County District Attorney filed an information alleging the following: discharging a firearm at an inhabited dwelling (Pen. Code, § 246; count 1);[1] assault with a firearm (§ 245, subd. (a)(2); count 2); possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3); assisting in felonious conduct by gang members (§ 186.22, subd. (a); count 4)[2]; and possession of a short-barreled rifle (§ 33215; count 5).

It was additionally alleged defendant committed these offenses for the benefit of or in association with a criminal street gang (§ 186.22, subd. (b)(1)), that defendant had suffered one prior strike conviction (§§ 667, subds. (c)–(j), 1170.12, subds. (a)–(e)), that this same prior was also a serious felony (§ 667, subd. (a)), and that defendant had served

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

[2] Count 4 was dismissed on January 10, 2013, prior to trial.

two prior terms in prison and failed to remain free of custody for a period of five years after being released (§ 667.5, subd. (b).)

On January 25, 2013, the jury convicted defendant of counts 3 and 5, but found him not guilty on the remaining counts. The jury did not find defendant committed the offenses for the benefit of a criminal street gang (§186.22, subd. (b)(1)).

On January 28, 2013, the trial court found the remaining allegations true, except the court found the section 667, subdivision (a), allegation to not be applicable to counts 3 and 5.

On March 25, 2013, defendant filed a motion pursuant to section 1385 and *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*), requesting the court to dismiss his prior strike conviction. At sentencing on March 27, 2013, the trial court denied the *Romero* motion. Defendant was sentenced to eight years in prison with credit for 770 days in custody.

On appeal, defendant contends the prosecutor committed misconduct by misrepresenting the law of self-defense during closing arguments. He argues the misconduct rendered the trial fundamentally unfair, requiring reversal under either *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) or *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). He also maintains the trial court abused its discretion in denying the *Romero* motion. We find defendant's arguments unpersuasive and affirm.

## *FACTUAL BACKGROUND*

Defendant does not challenge the sufficiency of the evidence supporting the jury's convictions. As such, set forth below are those facts taken in the light most favorable to the jury's verdicts and relevant to defendant's contentions on appeal.

### *Prosecution facts*

On March 8, 2012, H.C. lived in the rear of a unit at 2213 Nelson Street in Bakersfield. At about 7:45 a.m. he left and walked with his brother, cousin and a friend with the intention of going to a store. They walked to the next street, Robinson, where

they encountered a barking dog at a residence. A man, later identified as defendant, came out of a shed on the front of that property and asked why the dog was barking. Words were exchanged between defendant and H.C., and defendant swung at H.C. H.C. hit defendant two times, and defendant fell to the ground; H.C. hit defendant again and then ran back to his residence.

After arriving home, H.C. told his mother he was involved in a fight and a few minutes later he heard his uncle screaming in their front yard. H.C. ran outside and saw defendant fighting with H.C.'s uncle. H.C. told defendant to fight him and they had a second fist fight, wherein H.C. knocked defendant unconscious. H.C. woke defendant up, and defendant walked away and said, "Don't go anywhere" and that he "had something" for H.C. Defendant also stated he was "OG from the Water Street Loma."

About 15 to 18 minutes later, H.C. was in his front yard and he heard two gunshots. H.C. saw defendant running away so he chased him. Defendant ran through an alley to the back of H.C.'s property, where he shot again. H.C. saw defendant carrying a sawed-off shotgun. H.C., along with members of H.C.'s family, continued to chase defendant, who got away, but H.C. saw defendant drop the shotgun.

Kern County Sheriff's Deputy Darren Wonderly was dispatched to the area. He saw defendant walking on Nelson Street near H.C.'s residence and noticed defendant was carrying something "long and black" in his right hand. Defendant looked at Wonderly and, as soon as he saw Wonderly, defendant threw the black-colored object away and ran. Wonderly lost sight of defendant. Wonderly recovered a 12-gauge sawed-off Mossberg shotgun[3] from the location where defendant had thrown the object. He also found two spent 12-gauge shotgun rounds in the street.

---

[3]     The sawed-off shotgun had a barrel length of 15 and one-half inches and an overall dimension of 23 and one-half inches from the front of the barrel to the end of the receiver.

A neighbor on Nelson Street, Inocente Lopez, testified he saw a group of people jump on and assault defendant, who did not fight back. Lopez saw defendant on the ground trying to cover himself as he was beaten. When the fight was over, defendant left but came back "about five minutes later" with a weapon.

Lopez saw defendant fire two or three times "at the ground." Defendant aimed the shotgun in the direction of H.C.'s residence but kept the weapon pointed downwards. Lopez never saw defendant fire the weapon at any people or houses. Defendant threw his weapon and ran when a sheriff's deputy approached.

Kern County Sheriff's Deputy Diego Gonzalez apprehended defendant later that same day at an apartment on Robinson Street where defendant's sister lived. Defendant told Gonzalez he had been "jumped" by a group of juveniles who "beat his ass." Defendant explained he went outside his house because his dog was barking and he saw six Hispanic and black males standing inside his yard. Defendant recognized the youths from the neighborhood and asked why they were in his yard and they responded they were looking for someone. When defendant asked for whom, one of the juveniles approached defendant and challenged him to a fight. Defendant felt like all of the juveniles participated in the fight. Defendant told Gonzalez he walked to his sister's house at 2306 Robinson Street after the fight stopped, but he did not remember anything because he had "blacked out."

### *Defense evidence*

Defendant's neighbor, Penny Nicole Rush, lived on Robinson Street and saw five or six teenage boys attacking defendant on his property. Rush recognized the boys as "troublemakers" in the neighborhood with a reputation for being "out-of-control" with parents who do not care. Rush drove away to take her daughter to school and to get her daughter to safety. While Rush was driving home, she saw the boys attacking defendant at another location. Defendant was knocked to the ground and he began to run from

them. Defendant looked hurt but he got into a white car, which drove away. She did not hear any shots fired.

Defendant testified on his own behalf. On March 8, 2012, he slept in a shed next to his apartment. He was woken by his dog barking so he went outside and confronted five teenagers on his property, three in his driveway and two closer to his front door. He asked what they were doing there, and they responded they were looking for somebody. Defendant told them they were lying and said so because only his family was at that location. Defendant approached them and H.C. said, "You want it? You want it?" H.C. hit defendant, and defendant felt other people hitting him too and he fell backwards. The juveniles stopped hitting him and he saw them run into an alley.

Defendant recognized H.C. from the neighborhood and believed he could speak with H.C.'s mother about what happened. He believed he knew where they lived so he decided to go speak with her to complain. He did not contact law enforcement because he just wanted to know why the juveniles acted as they did. He rode his bicycle to H.C.'s residence on Nelson Street where he encountered "five or six" people who prevented him from leaving. H.C. was in the middle of the group and they started beating defendant again. Defendant was knocked to the ground and lost consciousness, but he was able to get up at some point and he ran away. As he was fleeing, defendant saw a man he knew, Vicente, driving a white car. Defendant flagged down Vicente, who drove defendant away.

Defendant asked Vicente to drive him to the residence of Joe Hernandez, a friend of defendant's, where defendant obtained a shotgun from Hernandez's shed. The shotgun belonged to Hernandez, but defendant knew it was in the shed because they had shot it on New Year's Eve. Defendant retrieved the shotgun for protection and asked Vicente to drive him home.

As soon as he returned home, defendant saw his shed door had been kicked in. Another neighbor, who only spoke Spanish, gestured towards the shed door and indicated

6.

people had been there. Defendant was afraid and believed the same assailants had been back to his house. Defendant took the shotgun and walked back towards Nelson Street. He did not see anyone on Nelson Street and he stopped in view of H.C.'s residence. He remained in the middle of Nelson Street and could see H.C.'s yard, but defendant did not see anyone in that yard. Defendant fired the shotgun twice into the ground in view of H.C.'s residence hoping to scare the people without injuring anyone. He stated he acted only to protect his home, he was scared and believed these people were going to come back and harass him or his family, or jump him again.

After he fired the shotgun, defendant turned and saw Wonderly from the sheriff's department approaching. Defendant threw the weapon and fled to his sister's house.

At trial, defendant denied being an active member of the Loma Bakers gang, but he admitted to being a past gang member. He denied making any threats to H.C.

## *DISCUSSION*

### I. *The prosecutor did not commit misconduct*

#### A. *Background*

##### 1. *Jury instructions*

After the close of evidence, the trial court informed the jury, inter alia, that they were to follow the law as the court explained it to them, even if they disagreed with it. The jurors were further told to follow the court's instructions if they believed the attorneys' comments on the law conflicted with the instructions.

Regarding counts 3 and 5, the trial court instructed the jury regarding self-defense in relevant part as follows:

> "The defendant is not guilty of unlawful possession of a firearm as charged in Counts 3 and 5 if he temporarily possessed the firearm in self-defense.

> "The defendant possesses a firearm in lawful self-defense if, one, the defendant reasonably believed that he was in imminent danger of suffering great bodily injury; two, the defendant reasonably believed that the

7.

immediate use of force was necessary to defend against that danger; three, a firearm became available to the defendant without planning or preparation on his part; four, the defendant possessed the firearm temporarily, that is, for a period no longer than was necessary or reasonably appeared to have been necessary for self-defense; five, no other means of avoiding the danger or injury was available; and, six, the defendant's use of the firearm was reasonable under the circumstances.

"Belief in future harm is not sufficient no matter how great or how likely the harm is believed to be.  The defendant must have believed there was imminent danger of great bodily injury to himself.  Defendant's belief must have been reasonable, and he must have acted only because of that belief.  The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation.  If the defendant used more force than was reasonable, the defendant did not act in lawful self-defense.

"When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in a similar situation with similar knowledge would have believed.  If the defendant's beliefs were reasonable, the danger does not need to have actually existed.  [¶] … [¶]

"The defendant's belief that he was threatened may be reasonable even if he relied on information that was not true.  However, the defendant must actually and reasonably have believed that the information was true.

"If you find that [H.C.] and others threatened or harmed the defendant in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were reasonable.

"Someone who has been threatened or harmed by a person in the past is justified in acting more quickly or taking greater self-defense measures against that person.

"If you find that the defendant received a threat from someone else that he reasonably associated with [H.C.] and others, you may consider that threat in deciding whether the defendant was justified in acting in self-defense.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not temporarily possess the firearm in self-defense. If the People have not … met this burden, you must find the defendant not guilty of this crime."

8.

Regarding counts 1 and 2, the trial court instructed the jury that self-defense was a defense and defendant was not guilty of those crimes if he used force against the other person in lawful self-defense. The court repeated many of the same definitions as expressed for self-defense relative to counts 3 and 5 before providing the following:

> "A person who engages in mutual combat or who starts a fight has a right to self-defense only if, one, he actually and in good faith tried to stop the fight; two, he indicated by word or by conduct to his opponent in a way that a reasonable person would understand that he wanted to stop fighting and that he had stopped fighting; and, three, he gave his opponent a chance to stop fighting.

> "If the defendant meets these requirements, he then has a right to self-defense if the opponent continues to fight.

> "A fight is mutual combat when it began or continued by mutual consent or agreement. The agreement may be expressly stated or implied and must occur before the claim of self-defense arose.

> "A person does not have the right to self-defense if he or she provokes a fight or a quarrel with the intent to create an excuse to use force.

> "The right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends."

### 2. Closing arguments

#### Prosecutor

During closing arguments, the prosecutor informed the jury, in relevant part, that the only reasonable interpretation of the facts was that defendant "lost a fight that was mutual combat," and he went back to initiate another fight, but was beaten up again. A little later, the prosecutor stated "defendant, after this separate altercation, becomes free of [H.C.] and the other people, the other teenagers or youths that came from the 2213 Nelson Street [address]. He's free. Done. [¶] What does he do? He goes and gets a shotgun …." The prosecutor argued defendant took the weapon "and he goes back a

9.

second time, after losing two fights, to 2213 Nelson Street. Why? His own words: 'I wanted to scare them.' Far cry from self-defense."

Later, the prosecutor argued defendant did not face "imminent danger" because he was "free and clear of the people that he has been fighting with, that he's picked the second fight with, that he has promised to come back because he's got something for him. Where is the imminent [danger]? There is none." The prosecutor also argued it was not reasonable for defendant to believe "immediate use of force was necessary" because he went to a friend's house to obtain the shotgun, had time to collect it, went back to his residence, and then walked to Nelson Street.

### Defense counsel

Defense counsel argued, in relevant part, that defendant felt his life was threatened and did what any reasonable person would have done. He asserted defendant did not have an option to call law enforcement because of the neighborhood he lived in. He argued defendant retrieved the shotgun to protect his family and, instead of taking the shotgun directly to Nelson Street, he went home and discovered the damage to his property and learns the same people who "tried to kill him twice that morning had returned to the location of these actions and again attacked his home." Defense counsel argued defendant acted reasonably, after being "violated" and "beat[en] up" by these people, when he tried "to make them stop, and he goes to that location, and he opens fire with the shotgun into the ground, not in the direction of the dwelling, but enough to make a loud noise in order to make sure that they understand that now he is armed. Maybe the next time that they go to his house, he will be prepared to stop them. He tried talking. It didn't work. So he got himself a shotgun, and he made enough noise to make sure that they knew that he was now prepared."

10.

*Rebuttal*

During the prosecutor's rebuttal to the jury, the following exchange took place:

> "[THE PROSECUTOR]:  Remember that in self-defense, it's got to be the same engagement.  That's the crux of the law that I showed you.

> "[DEFENSE COUNSEL]:  Your Honor, that misstates the law.

> "THE COURT:  Ladies and gentlemen, the law has been provided to you for your consideration.  You can consider the jury instruction packet during deliberations as it will be provided to you.  You can then review the self-defense instructions that the attorneys have commented on.

> "[THE PROSECUTOR]:  When you withdraw from a fight saying, 'I've got something for you.  I am from the Loma,' that engagement ends.  When the people who beat you up walk away, that engagement ends, one of the many reasons why self-defense is not lawfully or factually permissible in this case."

## B.     Standard of review

"'A prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "'unfairness as to make the resulting conviction a denial of due process.'"  [Citations.]'"  (*People v. Thompson* (2010) 49 Cal.4th 79, 120.) "'Under state law, a prosecutor who uses such methods commits misconduct even when those actions do not result in a  fundamentally unfair trial.  [Citation.]  In order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.'  [Citations.]"  (*Id.* at pp. 120–121.)  "When a claim of misconduct is based on the prosecutor's comments before the jury, … '"the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."'  [Citation.]"  (*Id.* at p. 127.)

It is misconduct for a prosecutor to misstate the law.  (*People v. Whalen* (2013) 56 Cal.4th 1, 77.)  A showing of bad faith is not required to establish prosecutorial

11.

misconduct stemming from a misstatement of applicable law. (*People v. Hill* (1998) 17 Cal.4th 800, 822.)

### C. Analysis

Defendant argues the prosecutor committed misconduct because he misstated the law of self-defense.[4] He contends the law of self-defense, as it applies in situations involving mutual combat or when the defendant starts the fight, is "the reverse of what the prosecutor claimed." As such, defendant maintains the prosecutor's argument "distorted" the principle of self-defense in a mutual combat situation so that the jury may have believed defendant could not claim self-defense if an "'engagement'" ended, however briefly.

The trial court used CALCRIM No. 3474 and instructed the jury on counts 1 and 2 in relevant part as follows: "[t]he right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends." CALCRIM No. 3474 is based on the holding from this court in *People v. Perez* (1970) 12 Cal.App.3d 232, 236 (*Perez*).

In *Perez*, the defendant was arrested for driving a vehicle while intoxicated. During the booking process, the arresting officer grabbed him by the hair and slammed his head against a desk. Later, the officer had his back turned on the defendant, who hit the officer over his head with a stool. (*Perez*, *supra*, 12 Cal.App.3d at p. 234.) The defendant was convicted of battery upon a police officer engaged in his duties (§ 243).

---

**4** Defendant argues he did not waive or forfeit this issue on appeal despite defense counsel's failure to seek a curative admonition to the jury. Defendant contends any requested admonition would have been futile after the trial court failed to rule on the objection. Respondent does not offer any argument regarding whether defendant forfeited or waived this issue due to a failure to seek a curative admonition. We need not determine whether defendant preserved this issue for appeal or not because, when we address the substance of this claim, defendant's contentions are meritless.

On appeal, the defendant claimed the trial court erred, inter alia, in not instructing the jury on self-defense. The *Perez* court affirmed the judgment, stating "the right of self-defense is based upon the appearance of imminent peril to the person attacked. When that danger has passed and the attacker has withdrawn, there can be no justification for the use of further force. [Citations.]" (*Perez, supra*, at p. 236.)

Here, the prosecutor's comments that self-defense required the same engagement or that the engagement ended were part of the prosecutor's overall argument defendant could not rely on self-defense because his attackers withdrew and he no longer faced imminent danger. Indeed, in his initial arguments, the prosecutor informed the jury it was not reasonable for defendant to believe "immediate use of force was necessary" because he went to a friend's house to obtain the shotgun, had time to collect it, went back to his residence, and then walked to Nelson Street. Even when viewed in isolation as defendant appears to urge, the prosecutor's statements did not misrepresent the law of self-defense and were consistent with both *Perez* and CALCRIM No. 3474.

Likewise, the prosecutor's comments did not misstate or "distort" the law in a mutual combat situation. Regarding counts 1 and 2, the trial court utilized CALCRIM No. 3471[5] and instructed the jury regarding the use of self-defense in mutual combat.

---

[5] CALCRIM No. 3471 states:

"A person who (engages in mutual combat/ [or who] starts a fight) has a right to self-defense only if:

"(He/She) actually and in good faith tried to stop fighting;

"[AND]

"(He/She) indicated, by word or by conduct, to (his/her) opponent, in a way that a reasonable person would understand, that (he/she) wanted to stop fighting and that (he/she) had stopped fighting(;/.)

"*<Give element 3 in cases of mutual combat.>*

"[AND]

"(He/She) gave (his/her) opponent a chance to stop fighting.]

13.

The jury was instructed that, to have the right to rely on self-defense, defendant must have attempted to withdraw from the fight.

Immediately after this instruction was given, however, the trial court also instructed the jury that "[t]he right to use force in self-defense continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends." The prosecutor never argued defendant lost his right to self-defense because defendant attempted to withdraw. Rather, the prosecutor argued defendant no longer faced any reasonable peril. The prosecutor's comments were consistent with the trial court's jury instructions and the law, and did not ask the jury to "divide the facts" into "discrete" engagements, as defendant contends.

Defendant cites *People v. King* (1978) 22 Cal.3d 12 (*King*) to establish the prosecutor misstated the law. Defendant's reliance is misplaced. In *King*, the defendant, an ex-felon, was attending a party at an apartment when intruders attempted to force their way in. The defendant felt fear as did others in the apartment. (*Id.* at p. 26.) Another guest handed the defendant a gun and the defendant shot the gun only to frighten and not in an attempt to kill the intruders. The defendant was convicted of possession of a firearm as a convicted felon after the trial court refused to instruct the jury on self-defense. On appeal, the *King* court held the evidence was sufficient to require a jury

---

"If the defendant meets these requirements, (he/she) then had a right to self-defense if the opponent continued to fight.

"[However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting(,/ or) communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting].]

"[A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.]"

14.

instruction on the right to self-defense and a right to an instruction that if his possession of the weapon was solely for the purpose of self-defense, was not preplanned, and did not continue beyond the existence of the circumstances giving rise to the right to self-defense, the defendant could be found not guilty for his possession of the weapon by a felon. (*Id.* at pp. 26–27.) In reaching its holding, the *King* court stated the right to self-defense does "not continue beyond the existence of the circumstances giving rise to the right to self-defense .…" (*Ibid*.)

Here, when read as a whole, the prosecutor's argument was that defendant used the shotgun when he was no longer in peril. The prosecutor's arguments were not contrary to *King* and did not misstate the law. (*Perez, supra*, 12 Cal.App.3d at p. 236; CALCRIM No. 3474.) As such, because the prosecutor did not misstate the law, misconduct did not occur.

Because the prosecutor did not commit misconduct, defendant's remaining arguments have no merit. The jury was not "led astray" by the prosecutor's comments. The prosecutor did not "improperly" discourage the jurors from considering the "totality of [the] circumstances" or improperly encourage them to focus on defendant's "final actions." The prosecutor did not "frame the analysis" in a "legally inaccurate" or a "distorted way" in considering what a reasonable person might have done.

Further, the prosecutor did not misrepresent the legal principle that an individual who is the victim of antecedent threats or attacks is justified in using self-defense more quickly. The trial court instructed the jury on that principle utilizing CALCRIM No. 3470 and the prosecutor's arguments in no way contradicted that instruction. A review of the entire proceeding shows the prosecutor's actions did not infect the trial with a level of unfairness as to deprive defendant his due process rights. (*People v. Cole* (2004) 33 Cal.4th 1158, 1204.)

Moreover, even if we did characterize the prosecutor's comments as misconduct, defendant cannot show prejudice. The jury was informed that the court would supply the

15.

correct definition of self-defense and the jurors were instructed to follow the court's legal definitions if they felt the attorney's comments conflicted at all. Immediately following defense counsel's objection to the prosecutor's statements, the trial court advised the jurors the law had been provided to them in a packet that they could review and consider during deliberations. The jurors are presumed to have understood and followed the trial court's instructions. (*People v. Myles* (2012) 53 Cal.4th 1181, 1212.) The jurors are also presumed to be sufficiently capable of understanding and "'correlating'" all jury instructions given. (*People v. Richardson* (2008) 43 Cal.4th 959, 1028.) As such, in light of the legal instructions given by the trial court, and the admonition to follow those instructions if the attorneys said anything that conflicted, it is beyond a reasonable doubt the prosecutor's statements had no impact on the outcome of this trial. Despite defendant's arguments to the contrary, nothing in the prosecutor's statements expressly or impliedly advised the jurors to disregard the court's instructions. To the contrary, the prosecutor merely argued how the jury should view the evidence, which is permissible. (*People v. Cole*, *supra*, 33 Cal.4th at p. 1203 ["prosecutors 'have wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide'"].)

Considering the prosecutor's statements and the relevant jury instructions as a whole, there was no risk the jury was misled as to how to apply the law of self-defense. As such, defendant can neither show misconduct nor a fundamentally unfair trial. (*People v. Whalen*, *supra*, 56 Cal.4th at pp. 78–79.) Thus, defendant is not entitled to reversal under either *Chapman, supra,* 386 U.S. 18 or *Watson*, *supra*, 46 Cal.2d 818.

## II.     *The trial court did not abuse its discretion in denying the Romero motion*

Defendant argues the trial court abused its discretion when it denied the *Romero* motion to strike his prior strike conviction. He maintains the trial court did not accurately evaluate the nature and circumstances of the current convictions, ignored multiple obvious mitigating factors, and incorrectly asserted no factors in mitigation existed.

16.

*A.    Background*

In 2010, defendant was convicted of a strike offense for first degree burglary (§460, subd. (a)) for which he received three years of felony probation and one year in jail.

On March 25, 2013, defendant filed his *Romero* motion, arguing he shot the shotgun after he "was savagely beaten by a gang of juveniles and … after the said group attacked his home and his family therein." The motion emphasized the jury acquitted defendant of all serious charges alleged by the prosecution, nobody was injured by defendant's actions, no property damage occurred, and defendant used the weapon "only … for defensive purposes." The motion also listed certain facts about defendant, including his age, how he grew up in a poor neighborhood and spent time with the "wrong crowd," how he was changing and becoming a better, more responsible father, how he was active in his community abating graffiti and helping young men stay out of gangs, and how he was motivated to find employment again.

On March 27, 2013, the district attorney filed an opposition to defendant's *Romero* motion. The opposition argued defendant had an adult criminal record going back to 1993 involving narcotics and alcohol-related offenses, had two prison commitments in 2002 and 2007, and then suffered a strike conviction in 2010. The prosecutor argued defendant did not "fall outside the scope of the Three Strikes Law."

The sentencing hearing took place on March 27, 2013. Both parties submitted the issue without oral argument. In denying the *Romero* motion, the trial court stated the following:

> "It does appear, based on the motion, as well as the opposition filed, that striking the prior conviction from 2010 is something that this Court should consider. And in doing so, in considering the nature of the circumstances of the present offense, it was represented by way of argument that the jury believed that the defendant was defending himself and only used the weapon for defensive purposes only.

17.

"Counsel, I do recall the jury instructions given to this panel, as well as the evidence that was presented before that panel.

"And the jury could have, and ostensibly would have, acquitted the defendant of Counts 3 and 5 had they believed the self-defense argument provided, or the defense of other argument as stated in closing argument, because that was an absolute defense to both Counts 3 and 5.

"Likewise, the jury could have, and inferentially and most likely, believed that the defendant's shots did not assault the alleged victim, nor that the defendant's shots were traveling near in the vicinity or towards the residence alleged.

"For those reasons, the Court does infer reasonably that the jury reached these decisions not based on self-defense but based on the evidence as it was presented.

"In doing so[,] the Court must consider the circumstances of the present offense. And when considering the circumstances of the present offense, the defendant certainly armed himself with a firearm, and then proceeded to travel some distance on foot with that firearm before firing it a number of times. That was testified to by witnesses both called by the People, as well as by the defense.

"In considering the nature of the prior convictions or the defendant's criminal history as stated in the probation officer's report, [defendant], while he is approximately 37 years old, has suffered juvenile adjudications dating back to 1989, and then beginning in 1993 began suffering a number of misdemeanor convictions and felony convictions. Specifically, in 2010 the defendant was convicted of what is commonly referred to as [a] strike prior [f]or a conviction of a residential burglary.

"It does appear that his criminal record has been consistent since 1989 in that he suffered convictions, as well as probation violations— numerous probation violations, that entire time.

"It does not appear, therefore, that [defendant] falls outside the spirit of the Three Strikes Law. And based on a review of the present offense as well as criminal history, the Court is going to deny the [*Romero*] motion."

Later, in determining that the upper term was justified, the trial court stated:

"[Defendant], I can appreciate the circumstances that you found yourself under given the early morning hours of that particular day, as well as those individuals that surrounded you and assaulted you. That was never

18.

an issue and was never in question, to the extent that there was actually an assault.

"What was at issue was who started the assault. And based on the number of juveniles that were surrounding you and your conduct in relation to those juveniles, it's certainly something that the jury considered.

"The aftermath of that, and I'm speaking specifically as to the confrontation that occurred in front of the juvenile's residence, whether that could have been avoided or should have been avoided, we are certainly beyond that point. But, certainly, that is what precipitated you returning to that residence with a firearm.

"It does appear to the Court that that particular circumstance could have been avoided but for, perhaps, aggression, frustration, and anger taking the better part of most of those individuals involved, did it lead to an escalated act of violence.

"As to circumstances in mitigation, there aren't any.

"As to circumstances in aggravation, the defendant's prior convictions as an adult and sustained petitions in juvenile delinquency proceedings are numerous. He was on state parole and felony probation when this crime was committed. Defendant's prior performance on juvenile, misdemeanor, and felony probation, pursuant to Penal Code Section 1210.1, State parole and California Youth Authority parole was unsatisfactory in that he violated terms and continued to reoffend.

"He does qualify for punishment in the Department of Corrections based on this current offense, as well as his prior conviction from 2010.

"He does not appear to the Court to be a suitable candidate for felony probation. He is statutorily ineligible but for the Court finding unusual circumstances to grant him that opportunity. And this Court is unlikely to do so."

### B.    *Standard of review*

Section 1385, subdivision (a), gives the trial court discretion to dismiss a prior conviction, including a qualifying strike conviction, "in furtherance of justice." (*Romero*, *supra*, 13 Cal.4th at p. 530.) "[A] trial court's refusal or failure to dismiss or strike a prior conviction allegation under section 1385 is subject to review for abuse of discretion." (*People v. Carmony* (2004) 33 Cal.4th 367, 375.) Our Supreme Court has

19.

explained that in applying the abuse of discretion standard in the present context, we are guided by two essential principles: "First, '"[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve the legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review."' [Citations.]" (*Id.* at pp. 376–377.) "Second, a '"decision will not be reversed merely because reasonable people might disagree. 'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.'"' [Citations.] Taken together, these precepts establish that a trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*Id.* at p. 377.)

"'[T]he Three Strikes initiative, as well as the legislative act embodying its terms, was intended to restrict courts' discretion in sentencing repeat offenders.' [Citation.]" (*People v. Carmony*, *supra*, 33 Cal.4th at p. 377.) "To achieve this end, 'the Three Strikes law does not offer a discretionary sentencing choice, as do other sentencing laws, but establishes a sentencing requirement to be applied in every case where the defendant has at least one qualifying strike, unless the sentencing court "conclud[es] that an exception to the scheme should be made because, for articulable reasons which can withstand scrutiny for abuse, this defendant should be treated as though he actually fell outside the Three Strikes scheme."' [Citation.]" (*Ibid.*)

The Supreme Court has established "stringent standards that sentencing courts must follow" in order to find an exception to the Three Strikes scheme. (*People v. Carmony*, *supra*, 33 Cal.4th at p. 377.) "'[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation or finding under the Three Strikes law, on its own motion, "in furtherance of justice" pursuant to … section 1385[, subdivision ](a), or in reviewing such a ruling, the court in question must consider

20.

whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' [Citation.]" (*Ibid.*)

The Supreme Court has made clear "the three strikes law not only establishes a sentencing norm, it carefully circumscribes the trial court's power to depart from this norm and requires the court to explicitly justify its decision to do so. In doing so, the law creates a strong presumption that any sentence that conforms to these sentencing norms is both rational and proper." (*People v. Carmony*, *supra*, 33 Cal.4th at p. 378.) Because of this presumption, "a trial court will only abuse its discretion in failing to strike a prior felony conviction allegation in limited circumstances. For example, an abuse of discretion occurs where the trial court was not 'aware of its discretion' to dismiss [citation], or where the court considered impermissible factors in declining to dismiss [citation]." (*Ibid.*) The circumstances must be "'extraordinary … by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack ….'" (*Ibid.*)

### C.    *Analysis*

Defendant contends it was an abuse of discretion for the trial court to suggest no factors in mitigation existed. He argues three "obvious" mitigating factors under the California Rules of Court were present. First, the crime was committed because of an unusual circumstance, such as great provocation, that is unlikely to recur. (Cal. Rules of Court, rule 4.423(a)(3).) Second, the criminal conduct was partially excusable for a reason not amounting to a defense. (*Id.*, (a)(4).) Finally, defendant exercised caution to avoid harm to persons or damage to property. (*Id.*, (a)(6).) Defendant's arguments, however, are not supported by either the facts or the law.

21.

As an initial matter, defendant cites no authority for the proposition a trial court must analyze the factors in mitigation set forth in the California Rules of Court when denying a *Romero* motion. To the contrary, the Supreme Court requires a trial court to apply the Three Strikes law "'where the defendant has at least one qualifying strike, unless the sentencing court "conclud[es] that an exception to the scheme should be made because, for articulable reasons which can withstand scrutiny for abuse, this defendant should be treated as though he actually fell outside the Three Strikes scheme."' [Citation.]" (*People v. Carmony*, *supra*, 33 Cal.4th 377.)

Here, defendant had a least one qualifying strike. As such, the trial court correctly applied the Three Strikes law to defendant. (*People v. Carmony*, *supra*, 33 Cal.4th at p. 378.) Thus, a strong presumption exists that defendant's sentence was both rational and proper. (*Ibid.*)

The denial of defendant's *Romero* motion does not fall under the "limited circumstances" in which a trial court is said to have abused its discretion; the trial court was aware of its discretion to dismiss defendant's strike. (*People v. Carmony*, *supra*, 33 Cal.4th at p. 378.) The trial court also did not consider "impermissible factors in declining to dismiss .…" (*Ibid.*, citing *People v. Gillispie* (1997) 60 Cal.App.4th 429, 434 [court may not consider factors that violated] equal protection, "such as bias related to the defendant's race or national origin, or that under the peculiar circumstance of the case, the sentencing norms produced an 'arbitrary, capricious or patently absurd' result"].) Instead, the trial court considered defendant's written motion and identified factors it deemed significant when denying the motion.

Moreover, despite defendant's arguments to the contrary, the trial court was mindful of the circumstances surrounding defendant's present crimes. The trial court noted the jury must have inferentially believed defendant did not assault the alleged victim with his shots, which did not travel in the vicinity of or towards the victim's residence. When discussing sentencing, the trial court stated it could "appreciate the

circumstances" defendant found himself in after defendant was "surrounded" and "assaulted" by the individuals. Defendant is incorrect that the court "objectively misrepresented the nature and circumstances of the new offenses," or that it relied solely on defendant's background. To the contrary, the court was mindful that defendant armed himself with a sawed-off shotgun, walked some distance on foot with that firearm, and fired it more than once on a public road. The court also noted the second confrontation that occurred in front of the juvenile's residence could have been avoided.

Defendant relies on *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968 (*Alvarez*) for the proposition the court abused its discretion because it did not give "individualized consideration" to defendant's situation. As noted above, the court did review defendant's situation. Moreover, *Alvarez* did not deal with a trial court's discretion under section 1385, but, instead, examined a trial court's discretion to reduce a "wobbler" under section 17, subdivision (b), in light of the Three Strikes law. (*Alvarez*, *supra*, at pp. 977, 981.)

In light of defendant's criminal background and the circumstances surrounding the present crimes, there is nothing in the record demonstrating ""'articulable reasons which can withstand scrutiny for abuse"''" why defendant should fall outside the Three Strikes scheme. (*People v. Carmony*, *supra*, 33 Cal.4th at p. 377.) As noted by the trial court, defendant engaged in repeated criminal conduct and he was on state parole and felony probation when this crime was committed. Defendant repeated criminal activity since 1989 with numerous violations of probation. Based on a review of the record, the trial court did not abuse its broad discretion. (*Id*. at pp. 376–377.) The trial court's decision was not so irrational or arbitrary that no reasonable person could agree with it. (*Id*. at p. 377.) The trial court's ruling will not be reversed.

## *DISPOSITION*

The judgment is affirmed.

 

_____
                              Kane, J.

WE CONCUR:

 

_____
Levy, Acting P.J.

 

_____
Franson, J.

24.